COMMONWEALTH of Kentucky,
DEPARTMENT OF REVENUE,
Appellant,

v.

MAJESTIC COLLIERIES COMPANY
and Sovereign Coal Corporation,
Appellees.

Supreme Court of Kentucky.

Dec. 4, 1979.

Rehearing Denied April 1, 1980.

Frank A. Logan, Louisville, William P. Curlin, Jr., Frankfort, for appellant.

John M. Stephens, Stephens, Combs & Page, Pikeville, for appellees.

Jackson W. White, James Park, Jr., Lexington, for amicus curiae Cyclone Coal Corporation.

LUKOWSKY, Justice.

The issue presented is whether the lessees of coal interests, who had contract miners extract coal from the leasehold for them were the taxpayers engaged in severing coal who should have paid the coal severance tax. The Board of Tax Appeals said yes. The Circuit Court said no. We granted a joint request for transfer from the Court of Appeals. We reverse.

The facts are not in dispute. Majestic Collieries Company and Sovereign Coal Corporation are lessees of coal bearing properties having the right to remove and sell the coal and the duty to pay royalties to the lessor. These lessees entered into oral contracts with "contract miners" to physically sever the coal from the leasehold and to deliver the coal to the point at which it was loaded into rail cars. Sovereign and Majestic paid these contract miners for their services an agreed amount per ton of coal delivered over the scales. Sovereign and Majestic then sold the coal to the ultimate consumer through the use of a common marketing company.

Sovereign and Majestic filed returns and paid the severance tax due under KRS Chapter 143 for the coal severed in the names of the contract miners. The funds came from either amounts withheld from payments made to the contract miners or by payments made on their behalf. The "gross value" used to compute the tax was the amount Majestic and Sovereign paid the contract miners for their services, not the proceeds from the sales to the ultimate consumer.

In the briefs and at oral argument much ado was made about the "independent contractor" status, or lack thereof, of the con-

tract miners. We are shown that the hiring and firing of employees and the negotiation of collective bargaining agreements lies with the contract miners. Further, the equipment is owned by these contract miners, although financing is sometimes provided by Majestic or Sovereign. The strip mine permits are issued to the contract miners, but the lessees must consent as owners of the coal. The contract miners paid workmen's compensation insurance on their employees, except in a few cases in which Majestic and Sovereign stepped in and made the payments.

If this was an agency case concerning the liability of the principal for the debts incurred by his agent, or if this was a tort case involving the responsibility of the master for the acts of his servant, then the evaluation of the contract miners and lessees relationship in terms of independent contractor would be pertinent. *See Locust Coal Company v. Bennett*, Ky., 325 S.W.2d 322, 324 (1959) for a list of the traditional evaluative factors to determine whether a particular relationship is that of independent contractor. But, it is neither. This is a tax case. The incidents of taxation are set out by the statute. It is to the statute we must look to determine who is the taxpayer.

KRS 143.010(5) stated: " 'Taxpayer' shall mean and include any individual, partnership, joint venture, association, or corporation engaged in severing coal in this state." KRS 143.010(3) defined severing as "the physical removal of coal from the earth in this state." Majestic and Sovereign submit that because the contract miners actually do the mining of the coal, they are the ones who "sever" the coal and are the taxpayers.

Majestic and Sovereign owned the right to extract the coal and sell it. They arranged with the contract miners to perform the mining and transportation tasks for them. They paid the contract miners a per ton compensation for the cost of removing the coal. The contract miners never owned the coal nor sold it to Sovereign and Majestic. Rather, the contract miners dug the coal which Sovereign and Majestic wanted

mined. Logically, the "gross value" of the coal severed is not the price paid the contract miners for their labors. This figure is but a cost of doing business of Majestic and Sovereign.

KRS 143.010(5) required this result. A "taxpayer" is one *"engaged in severing coal."* The argument of Majestic and Sovereign, taken to its logical conclusion, would result in the coal severance tax being levied upon the individual pick miner or machine operator merely because he is the one who physically removes the coal from the earth. Majestic and Sovereign were engaged in severing coal from their leaseholds, and the payments to the contract miners were a business expense necessary to get the coal out of the ground and to the rail car where it could be sold at the market price. In short, the contract miners were the tools with which Majestic and Sovereign severed the coal. Accord, *Clay County v. Leslie County*, Ky., 531 S.W.2d 524 (1975).

Because we conclude that KRS Chapter 143 clearly makes Majestic and Sovereign the taxpayers engaged in severing coal in Kentucky, it is unnecessary for us to decide whether the administrative regulations cited are ultra vires.

The arguments that the 1978 amendments to the coal taxation statute indicate the legislature meant to clear an ambiguity (commonwealth) or to expand that tax and revenue (Majestic and Sovereign) are mere sophism. The conclusions are equally plausible. There is no legislative history and we decline to speculate. We rely on the language of the statutes.

The judgment of the Pike Circuit Court is reversed and the cause is remanded with directions to reinstate the order of the Board of Tax Appeals.

All concur except AKER and STEPHENSON, JJ., who dissent.

STEPHENSON, Justice, dissenting.

In my view the majority opinion treats the "contract miners" here as if they were employees. However they are described, the fact remains that they are coal opera-

tors, operating a coal mine and performing all the incidences of employing ·labor and paying customary expenses incurred in the operation of the mine, including paying the cost of transporting coal to the rail processing plant.

It appears to me that the majority here is enchanted with the fact that Majestic and Sovereign have the coal under lease with the sole right to mine and apparently have laid off tracts to the operators and granted them a license to mine without passing title to the coal and require that the coal be brought to the Majestic-Sovereign processing plant for a price to be set by Majestic and Sovereign. This arrangement on the part of Majestic and Sovereign is to take advantage of Federal tax laws, and I fail to see how this arrangement should affect tax liability under a Kentucky tax statute in the absence of specific statutory language.

The following examples illustrate the weakness of the reasoning in the majority opinion.

Example 1. Majestic and Sovereign do not own a coal lease; they, however, persuade the coal operators to install mines on property where the coal operator has the lease from the mineral owner. They contract with the coal operator to bring his coal to the processing plant at a price the same as in the instant case. We do not have any question of title to the coal. There would be no question but that the coal operator alone would be liable for the severance tax since he severed the coal.

Example 2. Majestic and Sovereign have a processing plant; small coal operators with their own leases mine, transport and sell coal to the plant. Obviously the small coal operator alone is liable for the severance tax.

Example 3. Majestic and Sovereign in the present situation, for the reason of lack of orders for coal. give permission to the "contract miners" to take the coal to another processing plant where they are paid the same amount as paid by Majestic and Sovereign. Again it is obvious that the coal operator alone is liable for the severance tax.

This would also be true in the situation where the coal operator takes the coal to another processing plant without the permission of Majestic and Sovereign. Aside from all the legal difficulties that would be encountered by the coal operator, he alone would be liable for the severance tax.

In the absence of express language, it seems preposterous that Majestic-Sovereign would be liable in this situation, and the processor in other situations illustrated in the examples would not be liable.

These examples illustrate that the General Assembly did not have the coal processor in mind at all when the severance tax was enacted. Rather, the General Assembly had in mind that a coal operator owns and operates both the mine and the processing plant at the railroad. This is obvious to me from the plain language of the statute.

The severance tax as originally enacted was simple in its terms. The pertinent portions follow:

"143.010 Definitions

As used in this chapter, unless the context requires otherwise:

*　　*　　*　　*　　*　　*

(3) 'Severed,' 'severing,' or 'severance' means the physical removal of coal from the earth in this state.

*　　*　　*　　*　　*　　*

(5) 'Taxpayer' shall mean and include any individual, partnership, joint venture, association, or corporation engaged in severing coal in this state.

(6) 'Gross value' is defined as follows:

(a) For coal severed and sold during a reporting period, gross value is the amount received or receivable by the taxpayer;

(b) For coal severed but not sold during a reporting period, gross value shall be determined as follows:

1. If the coal is to be sold under the terms of an existing contract, the contract price shall be used in computing gross value.

*　　*　　*　　*　　*　　*

143.020 Imposition of Severance tax

On and after July 1, 1976, in addition to all other taxes imposed by law, a severance tax is hereby levied on every taxpayer measured by the coal severed. The tax shall be four and one-half percent (4½%) of the gross value of all coal severed during the reporting period; except that the minimum severance tax liability for a reporting period shall be an amount determined by applying a rate of fifty cents (50¢) per ton to the total number of tons served during the reporting period."

However, the General Assembly in 1978, having realized that taxing the severance of the coal alone was permitting the coal processor to escape the tax, amended the severance tax statute in the following pertinent parts:

"143.010. Definitions. As used in this chapter unless the context requires otherwise:

*     *     *     *     *     *

(3) 'Severed,' 'severing,' or 'severance' means the physical removal of coal from the earth in this state.

*     *     *     *     *     *

(5) 'Taxpayer' shall mean and include any individual, partnership, joint venture, association, or corporation engaged in severing and/or processing coal in this state. In instances where contracts, either oral or written, are entered into whereby persons, organizations, or businesses are engaged to mine or process the coal but do not obtain title to or do not have an economic interest therein, the party who owns the coal or has an economic interest is the taxpayer.

(6) 'Gross value' is synonymous with gross income from property as defined in section 613(c) of the Internal Revenue Code and regulations 1.613–3 and 1.613–4 in effect on December 31, 1977, with the exception that in all instances transportation expense (whether or not by common carrier) incurred in transporting coal shall not be considered as gross income from the property. Gross value is to be reported as follows:

(a) For coal severed and/or processed and sold during a reporting period, gross value is the amount received or receivable by the taxpayer.

*     *     *     *     *     *

(e) *If severed coal is purchased for the purpose of processing and resale, the gross value is the amount received or receivable during the reporting period reduced by the amount paid or payable to the taxpayer actually severing the coal.* (Emphasis added.)

*     *     *     *     *     *

(8) 'Processing' includes cleaning, breaking, sizing, dust allaying, treating to prevent freezing, or loading for shipment.

*     *     *     *     *     *

(9) 'Related party' means two (2) or more persons, organizations, or businesses owned or controlled directly or indirectly by the same interest. Control exists if a contract or lease, either written or oral is entered into whereby one (1) party mines or processes coal owned or held by another party and the owner or lessor participates in the mining, processing, or marketing of the coal or receives any value other than an arm's length passive royalty interest. In the case of related parties, the department may apportion or allocate the receipts between or among such persons, organizations, or businesses if it determines that such apportionment or allocation is necessary in order to more clearly reflect gross value.

(10) 'Economic interest' for the purposes of this chapter is synonymous with the economic interest ownership required by Internal Revenue Code section 611 in effect on December 31, 1977, entitling the taxpayer to a depletion deduction for income tax purposes with the exception that a party who only receives an arm's length royalty shall not be considered as having an economic interest."

"143.020. Imposition of tax on severance or processing of coal. For the privilege of severing or processing coal, in addition to all other taxes imposed by law, a tax is hereby levied on every tax-

payer engaged in severing and/or processing coal within this Commonwealth at the rate of four and one-half percent (4.50%) of the gross value of all coal severed and/or processed during the reporting period; except that the minimum tax for a reporting period shall be an amount determined by applying a rate of fifty cents (50¢) per ton to the total number of tons severed during the reporting period. The minimum tax shall not apply to a taxpayer who only processes coal."

Now we have not only a severance tax but a sales tax. The entity severing the coal pays tax on the price paid by the processing plant, and the processing plant pays tax on the difference between the price paid by the processing plant and the price on resale received by the processing plant. (KRS 143.010(6)(e)).

The majority opinion rejects out of hand placing any significance on the language of the amending statute, concluding that both the arguments of Majestic-Sovereign and the Department are equally plausible. This misses the point. The General Assembly by the plain terms of the statute recognized that in situations as here, and as contained in the above examples, the Commonwealth was losing revenue. The amendment cured the deficiency clearly and without ambiguity, just as the original simpler statute is clear and without ambiguity. Before amendment, the tax was to be paid by the entity severing the coal, not the processor! The reasoning of the majority opinion ignores the fact that the severance statute before amendment would not impose liability on processors in Examples 1, 2, and 3, and we are led to believe the General Assembly only intended these processors here be covered. The 1978 amendment covers all processors specifically and enlarges the statute from a strict severance statute to a combination severance and sales tax statute.

The statement that the logical extension of the argument of Majestic and Sovereign would be to impose the tax on the individu-

al miner is absurd. After all he does not receive any funds for the coal.

I have read *Clay County v. Leslie County,* Ky., 531 S.W.2d 524 (1975), again and how it can be cited as authority for the majority opinion baffles me!

The depletion regulation adopted by the Department is a clear enlargement of the statute and is *ultra vires.*

I would affirm the judgment of the trial court.

AKER, J., joins in this dissent.